**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

_____
                                        :
MARIA L. MARTINEZ,                      :
                                        :
          Plaintiff,                    :
                                        :          Civil Action No. 04-4936 (JAG)
               v.                       :
                                        :                  **OPINION**
COMMISSIONER OF SOCIAL                  :
SECURITY ADMINISTRATION,                :
                                        :
          Defendant.                    :
_____:


**GREENAWAY, JR., U.S.D.J.**

**INTRODUCTION**

Maria L. Martinez ("Plaintiff"), pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeks

this Court's review of the decision by the Commissioner of the Social Security Administration

("Commissioner") denying her application for Supplemental Security Income ("SSI") benefits.

For the reasons stated below, this Court finds that the Commissioner's decision is supported by

substantial evidence and will be affirmed.

**PROCEDURAL HISTORY**

Plaintiff filed her application for SSI on May 5, 1999. (Tr. 79.) That application was

denied both initially and upon reconsideration. (Tr. 52-54, 57-59.) Plaintiff then requested a

hearing with an Administrative Law Judge ("ALJ") and appeared before ALJ Edward J. McNeil

on July 31, 2002. (Tr. 31.) On September 26, 2002, ALJ McNeil rendered a decision finding

1

Plaintiff not disabled.  (Tr. 49.)  The Social Security Administration's Office of Hearings and Appeals denied a review of the ALJ's decision on August 17, 2004.  (Tr. 4-7.)  Plaintiff subsequently brought the present action.

## STATEMENT OF THE FACTS

### A.   Plaintiff's General and Vocational Background

Plaintiff was born in Puerto Rico in 1962 and came to the United States mainland in or around 1988.  (Tr. 35.)  At the time of the hearing before ALJ McNeil, Plaintiff was a single mother of five children, the youngest of which was 13 years old.  (Id.)  She had not completed school beyond the eighth grade.  (Tr. 36.)  Her income was from welfare and food stamps and she received a housing subsidy under the Section 8 program.  (Tr. 36-37.)

Prior to January of 1999, Plaintiff worked as a machine operator, housekeeper, and packer.  (Tr. 92-93.)  In her longest-held position as a machine operator, Plaintiff was required to stand for eight hours each day and to lift objects weighing ten pounds frequently, as well as occasionally lifting objects weighing up to 20 pounds.  (Tr. 93.)  Plaintiff testified before ALJ McNeil that she had held positions as a packer and as a machine operator for a parts manufacturing company and that she had cleaned offices with a cleaning company.  (Tr. 37-38.) While Plaintiff reported on her application and at the hearing that she had stopped working in January of 1999 (Tr. 38, 93), she reported earnings from Rapid Manufacturing Company of $3,655.37 for the year 1999 and self-employment income of $6,881 for the year 2000.  (Tr. 84-86.)

### B.   Plaintiff's Medical History and Alleged Disability

Plaintiff alleged in her application that she was unable to work due to seizures, allergies,

2

and asthma, and that she suffered from blackouts without warning.  (Tr. 92.)  She indicated that these conditions rendered her unable to work beginning in January of 1994, but that she did not stop working until January of 1999.  (Id.)  Plaintiff also asserted that she had a history of depression.  (Tr. 160.)

Evidence of Plaintiff's medical history included in the transcript consists of reports by Plaintiff's treating physician, Dr. Thomas Ortiz, consultative examinations of Plaintiff by Drs. Luis Zeiguer, Z. Teklaberhan, Maria Vastesaeger, and Marc Friedman, and a review of Plaintiff's medical records by state agency physicians Dr. B. Mirti and Dr. Tillman.  (Tr. 2.)

### 1. Testimony of Plaintiff Before the Administrative Law Judge

Plaintiff testified before ALJ McNeil on July 31, 2002.  (Tr. 31.)  She stated that she previously worked for a machine company that made parts and that she also worked as a packer for the same company.  (Tr. 37.)  She also stated that she worked as a housekeeper, cleaning offices.  (Tr. 37-38.)  Plaintiff testified that she quit working because working made her dizzy and sick to her stomach.  (Tr. 38.)  She stated that she took Meclizine for her dizziness and that it kept it under control.  (Tr. 38-40.)  Her doctors have not required her to carry a cane.  (Tr. 41.)  Plaintiff proffered that she has asthma for which she uses an Albuterol pump.  (Tr. 42.)

Plaintiff also testified that she is seeing a psychiatrist because she hears voices.  (Tr. 44-45.)  She said that she takes medication for the voices, but was not sure what medication it was.  (Tr. 45-46.)

### 2. Treatment by Dr. Thomas Ortiz

Plaintiff's medical records dating from January of 1998 to May of 2000 were submitted by her primary physician, Dr. Ortiz.  (Tr. 144-59.)  The records show that Plaintiff was diagnosed

with Hepatitis B, but there is no mention of ongoing treatment nor are complaints related to that condition to be found in Plaintiff's medical history from February of 1999 to January of 2000. (Tr. 145-46, 154-55.)

The majority of Plaintiff's visits to Dr. Ortiz involved her asthma and/or allergies.  (See Tr. 156-59.)  She was prescribed Claritin D and Nasonex spray to alleviate these problems.  Id. Plaintiff also complained of anxiety.  (Tr. 157-58.)  She was prescribed Zoloft and reported that it was working.  (Tr. 158-59.)

Dr. Siclali, a physician with Dr. Ortiz's office, testified via telephone that Plaintiff has no history of seizures and has not been on seizure medication.  (Tr. 126.)  He also stated that Plaintiff has mild asthma.  (Id.)

### 3.    Consultative Examination by Dr. Luis Zeiguer

Dr. Zeiguer examined Plaintiff on January 19, 2000.  (Tr. 131.)  Plaintiff reported that she had stopped working due to frequent episodes of fainting which began in 1995.  (Tr. 131-32.) She said that she had an EEG performed at Columbus Hospital and an MRI of the brain performed at Clara Maass Medical Center.  (Tr. 132.)  She reported that she was taken to the emergency room at United Hospital, UMD, and Columbus Hospital as a result of her fainting. (Id.)  Dr. Zeiguer noted that he did not have the opportunity to review the EEG or the MRI that had allegedly been performed.  (Tr. 133.)

Plaintiff reported that she had taken Prozac in the past and was taking Zoloft and Xanax at the time of the examination.  (Id.)  She denied any symptoms of anxiety and said that she did not have a history of psychosis, psychiatric hospitalization, or suicide attempts.  (Id.)  Dr. Zeiguer noted that her psychiatric prognosis was "fair" and that "personality-wise she was able to relate

4

to job responsibilities."  (Id.)

Plaintiff also reported that she suffered from respiratory allergies and bronchial asthma and was taking Claritin.  (Id.)

### 4.    Consultative Examination by Dr. Z. Teklaberhan

Dr. Teklaberhan examined Plaintiff on March 1, 2000.  (Tr. 134.)  Plaintiff reported that she had a history of dizziness with blurring of vision and blackouts five times per month.  (Id.) The report also states that she has never been hospitalized nor taken to the emergency room for her dizziness and that it has not been investigated.  (Tr. 134-35.)

Plaintiff reported that she had suffered from asthma for the past five years and that her asthma attacks were exacerbated by dust, cold, and allergies like dogs and cats.  (Tr. 134.)  She said that these attacks occurred every two or three months, her last attack having been three months prior to the examination.  (Id.)  It was noted that she was using an Albuterol inhaler and taking Claritin D.  (Id.)  She reported that she used her inhaler during her last asthma attack and that it made her feel better.  (Id.)  Plaintiff reported that she had never been hospitalized and had not visited an emergency room in the past year, nor had she been intubated or put on systemic steroids.  (Id.)

Plaintiff was noted as being alert, oriented to time, place, and person, with a stable gait, and having no sensory-motor deficit.  (Id.)

Dr. Teklaberhan noted his impression as mild persistent asthma and a history of dizziness which needed further investigation.  (Tr. 136.)

### 5.    Consultative Examination by Dr. Maria Vastesaeger

Dr. Vastesaeger examined Plaintiff on June 28, 2001.  (Tr. 166.)  Plaintiff reported that

she had experienced asthma attacks since 1993 with the frequency of about one attack every

month.  (Id.)  Attacks were typically brought on by cold, dust, and animals.  (Id.)  She reported

that her inhaler relieves these attacks within 20 minutes and that she had not been hospitalized

nor had she visited the emergency room in connection with her asthma.  (Id.)

Plaintiff also reported that she had a history of depression, but Dr. Vastesaeger notes that

Plaintiff had not been hospitalized or treated by a psychiatrist.  (Id.)  Plaintiff also reported that

she had suffered a loss of appetite, crying spells, and insomnia, and that she had fleeting suicidal

ideations.  (Id.)

Dr. Vastesaeger included as an addendum that Plaintiff suffered from migraine headaches

lasting about six hours and occurring about three times per month.  (Tr. 167.)  Dr. Vastesaeger

noted under "Past Medical History" that Plaintiff described dizzy spells as a freezing of the

whole body with the mind intact, that during these spells the Plaintiff reports that she is only able

to move one finger and then she falls to the ground, and that the spells increase in frequency

when her depression gets worse.  (Id.)

Dr. Vastesaeger noted that Plaintiff was taking Motrin, Gaviscon, Allegra D, and Prozac,

and that she used an Albuterol inhaler.  (Id.)  She diagnosed Plaintiff with asthma, suicidal

depression, gastritis, and migraine headaches.  (Tr. 168.)

**6.**     **Consultative Examination by Dr. Marc Friedman**

Dr. Friedman examined Plaintiff on August 10, 2001.  (Tr. 187.)  Plaintiff indicated to

Dr. Friedman that she experienced dizzy spells two or three times per month during which she

fell to the ground and was unable to move.  (Id.)  She said that her doctors told her that she had

problems with her nerves.  (Tr. 188.)  She said that she was taking Prozac to treat this nerve

6

problem and that it helped.  (Id.)

Plaintiff reported that she is afraid to go out alone for fear that she will have a dizzy spell. (Id.)  She stated that she is able to do cooking and cleaning around the house.  (Id.)

In terms of cognitive abilities, Dr. Friedman estimated her intelligence to be borderline. (Tr. 189.)

Dr. Friedman concluded that Plaintiff showed signs of a major depressive disorder recurrent and may have been experiencing seizures, though the latter would have to be evaluated by a neurologist.  (Id.)

### 7.    Review by State Agency Doctors

Dr. B. Minti reviewed Plaintiff's medical record and concluded that Plaintiff was capable of lifting 50 pounds occasionally and 25 pounds frequently, that she could sit, stand, or walk about six hours in an eight-hour workday, and that she was not limited in operating hand or foot controls.  (Id.)  Dr. Minti found that she should be limited to only occasionally climbing stairs or ladders and that she should avoid constant exposure to extreme cold, extreme heat, wetness, humidity, and fumes, odors, dusts, gases, etc. (Tr. 181, 183.)  Dr. Minti stated that there was not enough diagnostic information in the record to determine if there is a medically determinable impairment responsible for Plaintiff's dizziness.  (Tr. 184.)

Dr. Tillman reviewed Plaintiff's psychiatric information and found that Plaintiff's impairment regarding her alleged anxiety related disorder was not severe.  (Tr. 190.)  He opined that Plaintiff suffered slight limitations in regard to activities of daily living, social functioning, and concentration.  (Tr. 197.)  He noted that there was no evidence that Plaintiff had experienced any episodes of deterioration at work or in a work-like setting.  (Id.)

7

## DISCUSSION

**A.**    **Standard of Review**

This Court has jurisdiction to review the Commissioner's decision under 42 U.S.C.

§ 405(g).  This Court must affirm the Commissioner's decision if it is "supported by substantial

evidence."  42 U.S.C. §§ 405(g), 1383(c)(3); Stunkard v. Sec'y of Health and Human Services,

841 F.2d 57, 59 (3d Cir. 1988); Doak v. Heckler, 790 F.2d 26, 28 (3d Cir. 1986).  Substantial

evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co.

v. NLRB, 305 U.S. 197, 229 (1938)).  Substantial evidence "is more than a mere scintilla of

evidence but may be less than a preponderance."  Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir.

1988) (citing Stunkard, 841 F.2d at 59).  The reviewing court must consider the totality of the

evidence and then determine whether there is substantial evidence to support the Commissioner's

decision.  See Taybron v. Harris, 667 F.2d 412, 413 (3d Cir. 1981).  Furthermore, the reviewing

court is not "empowered to weigh the evidence or substitute its conclusions for those of the

fact-finder."  Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992), cert. denied sub nom.

Williams v. Shalala, 507 U.S. 924 (1993) (citing Early v. Heckler, 743 F.2d 1002, 1007 (3d Cir.

1984)).

In the determination of whether there is substantial evidence to support the

Commissioner's decision, the reviewing court must consider: "(1) the objective medical facts; (2)

the diagnoses and expert opinions of treating and examining physicians on subsidiary questions

of fact; (3) subjective evidence of pain testified to by the claimant and corroborated by family

and neighbors; (4) the claimant's educational background, work history and present age."

8

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1973); Curtin v. Harris, 508 F. Supp. 791, 793 (D.N.J. 1981). Where there is substantial evidence to support the Commissioner's decision, it is of no consequence that the record contains evidence which may also support a different conclusion.  Blalock, 483 F.2d at 775.

**B.      Statutory Standards**

The claimant bears the initial burden of establishing his or her disability.  42 U.S.C. § 423(d)(5).  To qualify for DIB or SSI benefits, a claimant must first establish that she is needy and aged, blind, or "disabled."  42 U.S.C. § 1381.  A claimant is deemed "disabled" under the Act if she is unable to "engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); see also Kangas v. Bowen, 823 F.2d 775, 777 (3d Cir. 1987).  Disability is predicated on whether a claimant's impairment is so severe that she "is not only unable to do her previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A); see also Nance v. Barnhart, 194 F. Supp. 2d 302, 316 (D. Del. 2002).  Finally, while subjective complaints of pain are considered, alone, they are not enough to establish disability.  42 U.S.C. § 423(d)(5)(A).  An impairment only qualifies as a disability if it "results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).

**C.      The Five Step Evaluation Process and the Burden of Proof**

Determinations of disability are made by the Commissioner, pursuant to the five-step

9

process outlined in 20 C.F.R. § 404.1520.  At the first step of the review, the Commissioner must

determine whether the claimant is currently engaged in substantial gainful activity.[1]  20 C.F.R.

§ 404.1520(b).  If a claimant is found to be engaged in such activity, the claimant is not

"disabled" and the disability claim will be denied.  Id.; Bowen v. Yuckert, 482 U.S. 137, 141

(1987).

      At step two, the Commissioner must determine whether the claimant is suffering from a

severe impairment.  20 C.F.R. §§ 404.1520(a)(ii), (c).  An impairment is severe if it

"significantly limits [a claimant's] physical or mental ability to do basic work activities."  Id.  In

determining whether the claimant has a severe impairment, the age, education, and work

experience of the claimant will not be considered.  Id.  If the claimant is found to have a severe

impairment, the Commissioner addresses step three of the process.

      At step three, the Commissioner compares the medical evidence of the claimant's

impairment(s) with the impairments presumed severe enough to preclude any gainful work, listed

in 20 C.F.R. Part 404, Subpart P, Appendix 1.  See 20 C.F.R. § 404.1594(f)(2).  If the claimant's

impairment(s) meets or equals one of the listed impairments, he will be found disabled under the

Social Security Act.  If the claimant does not suffer from a listed impairment or its equivalent,

the analysis proceeds to steps four and five.

      In Burnett v. Commissioner of Social Security, 220 F.3d 112, 119-20, 120 n.2 (3d Cir.

2000), the Third Circuit found that to deny a claim at step three, the ALJ must specify which

---

[1] Substantial gainful activity is "work that involved doing significant and productive physical or mental duties; and is done (or intended) for pay or profit."  20 C.F.R. § 404.1510.

10

listings[2] apply and give reasons why those listings are not met or equaled.  In Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004), however, the Third Circuit noted that "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis. Rather, the function of Burnett is to ensure that there is sufficient development of the record and explanation of findings to permit meaningful review."  Id.  An ALJ satisfies this standard by "clearly evaluating the available medical evidence in the record and then setting forth that evaluation in an opinion, even where the ALJ did not identify or analyze the most relevant listing."  Scatorchia v. Comm'r of Soc. Sec., 137 Fed. Appx. 468, 471 (3d Cir. 2005).

Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform his past relevant work.  20 C.F.R. § 404.1520(e).  If the claimant is able to perform his past relevant work, he will not be found disabled under the Act.  In Burnett, the Third Circuit set forth the analysis at step four:

> In step four, the ALJ must determine whether a claimant's residual functional capacity enables her to perform her past relevant work. This step involves three substeps: (1) the ALJ must make specific findings of fact as to the claimant's residual functional capacity; (2) the ALJ must make findings of the physical and mental demands of the claimant's past relevant work; and (3) the ALJ must compare the residual functional capacity to the past relevant work to determine whether claimant has the level of capability needed to perform the past relevant work.

Burnett, 220 F.3d at120.  If the claimant is unable to resume his past work, and his condition is deemed "severe," yet not listed, the evaluation moves to the final step.

At the fifth step, the burden of production shifts to the Commissioner, who must demonstrate that there are other jobs existing in significant numbers in the national economy

---

[2] Hereinafter "listings" refers to the list of severe impairments as found in 20 C.F.R. Part 404, Subpart P, Appendix 1.

11

which the claimant can perform, consistent with his medical impairments, age, education, past work experience, and residual functional capacity.  20 C.F.R. § 404.1560(c)(1).  If the ALJ finds a significant number of jobs that claimant can perform, claimant will not be found disabled.  Id.

When the claimant has only exertional limitations, the Commissioner may utilize the Medical-Vocational Guidelines found in 20 C.F.R. Part 404, Subpart P, Appendix 2 to meet the burden of establishing the existence of jobs in the national economy.  These guidelines dictate a result of "disabled" or "not disabled" according to combinations of vocational factors, i.e., age, education level, work history, and residual functional capacity.  These guidelines reflect the administrative notice taken of the number of jobs in the national economy that exist for particular combinations of vocational factors.  20 C.F.R. Part 404, Subpart P, Appendix 2, Paragraph 200.00(b).  When a claimant's vocational factors, as determined in the preceding steps of the evaluation, coincide with a combination listed in Appendix 2, the guideline directs a conclusion as to whether an individual is disabled.  20 C.F.R. § 404.1569; Heckler v. Campbell, 461 U.S. 458 (1983).  The claimant may rebut any finding of fact as to a vocational factor.  20 C.F.R. Part 404, Subpart P, Appendix 2, Paragraph 200.00(b).

Additionally, pursuant to 42 U.S.C. § 423(d)(2)(B), the Commissioner, in the five-step process, "must analyze the cumulative effect of the claimant's impairments in determining whether she is capable of performing work and is not disabled."  Plummer v. Apfel, 186 F.3d 422, 428 (3d Cir. 1999).  Moreover, "the combined impact of the impairments will be considered throughout the disability determination process."  42 U.S.C. § 423(d)(2)(B); 20 C.F.R. § 1523; Parker v. Barnhart, 244 F. Supp. 2d 360, 369 (D. Del. 2003).  However, the burden still remains on the Plaintiff to prove that the impairments in combination are severe enough to qualify him

12

for benefits.  See Williams v. Barnhart, 87 Fed. Appx. 240, 243 (3d Cir. 2004) (placing responsibility on the claimant to show how a combination-effects analysis would have resulted in a qualifying disability); see also Marcus v. Barnhart, No. 02-3714, 2003 WL 22016801, at *2 (E.D. Pa. Jun. 10, 2003) (stating that "the burden was on [Plaintiff] to show that the combined effect of her impairments limited one of the basic work abilities").

While Burnett involved a decision in which the ALJ's explanation of his step three determination was so inadequate as to be beyond meaningful judicial review, the Third Circuit applies its procedural requirements, as well as their interpretation in Jones, to every step of the decision.  See, e.g., Rivera v. Commissioner, 164 Fed. Appx. 260, 262 (3d Cir. 2006).  Thus, at every step, "the ALJ's decision must include sufficient evidence and analysis to allow for meaningful judicial review," but need not "adhere to a particular format."  Id.

**D.**     **Findings of the Administrative Law Judge**

ALJ McNeil analyzed the objective and subjective evidence under the framework of the five-step evaluation process outlined in 20 C.F.R. § 404.1520 (discussed supra).

As to step one of the evaluation, ALJ McNeil found that, while Plaintiff claimed that she had been out of work since January of 1999, she reported earnings of $6,881 in 2000.  (Tr. 23.) However, the ALJ did not find that this constituted substantial gainful employment and continued the evaluation process at step two.  (See Tr. 23-24.)

ALJ McNeil performed separate analyses of Plaintiff's claimed mental impairments (depression and anxiety) and physical impairments (asthma, dizziness, and seizures).

At step two, ALJ McNeil concluded that Plaintiff's mental impairments were severe within the meaning of the Regulations.  (Tr. 25.)  As to Plaintiff's physical impairments, ALJ

McNeil concluded that these impairments did not significantly limit Plaintiff's ability to do basic work activities, and thus did not meet the requirements of §§ 404.1520(a)(ii) and (c).  (Tr. 24.)

In reaching his conclusion, ALJ McNeil examined the reports of Drs. Teklaberhan, Vastesaeger, and Ortiz, including a telephone interview with Dr. Siclali, a physician in Dr. Ortiz's office.  He also reviewed the contents of a "seizure questionnaire" completed by Plaintiff's friend.  Based on these sources, ALJ McNeil found that, regarding her physical impairments, Plaintiff had not been hospitalized within the past five years and that, according to Plaintiff's testimony, her conditions were controlled by medications.  (Tr. 26.)

As to Plaintiff's asthma, ALJ McNeil found that Plaintiff's attacks were infrequent and that they were controlled through the use of medication.  (Id.)  Moreover, the ALJ found that Plaintiff has never required intubation, systemic steroids, or emergency room treatment, and that examinations revealed no wheezing, rales, rhonci, or respiratory distress.  (Id.)

As to Plaintiff's dizziness, ALJ McNeil found that there had been no history of seizures or underlying neurological impairments and that Plaintiff's doctors had opined that her dizziness may have been a consequence of her anxiety or her antidepressant medication.  ALJ McNeil also noted that no limitations or restrictions on Plaintiff's activities had been given by her doctors. (Id.)  He noted that Plaintiff's friend stated in the "seizure questionnaire" that she had witnessed the Plaintiff suffer from seizures six times over the course of six years, thus averaging only one alleged seizure each year.  (Tr. 27.)  Because ALJ McNeil found that Plaintiff's physical impairments were not severe, his analysis of physical impairments under the five-step evaluation process ended at step two.

Having found that Plaintiff suffered from a mental impairment that was severe within the

meaning of the regulations at step two, ALJ McNeil found at step three that Plaintiff did not have

an anxiety or depressive disorder which would meet the requirements of Section 12.00 of the

listings.  (Id.)  ALJ McNeil found that the B and C criteria of listing 12.06, which deals with

anxiety disorders, were not met.  (Id.)  20 C.F.R. Pt. 404, Subpt. P, App. 1.  ALJ McNeil further

noted that Plaintiff was able to maintain her personal hygiene, to complete normal daily tasks

including going shopping and to the laundromat, to socialize with friends and maintain

relationships, and to perform household chores.  (Id.)  Also noted was the fact that Plaintiff had

not received any ongoing psychiatric treatment nor had she been hospitalized in connection with

her mental impairments.  (Tr. 28.)

      At step four of his evaluation, ALJ McNeil concluded that Plaintiff had the physical

ability to perform "light work," requiring the ability to lift and carry objects weighing up to 20

pounds occasionally, and 10 pounds frequently, as well as the capacity to sit, stand, and/or walk

for a total of six hours in an eight-hour workday.  (Id.)  See 20 C.F.R. § 416.967.   ALJ McNeil

further found that Plaintiff retained the residual functional capacity to perform her past work as a

machine operator and packer with a manufacturing company and as an office cleaner.  (Tr. 28)

ALJ McNeil found that in those positions, Plaintiff would be required to stand for up to eight

hours in an eight-hour workday, to use equipment and handle large objects, and to lift up to 20

pounds.  (Id.)

      He further found that none of her statements indicated that she would be unable to devote

the mental attention and concentration necessary to perform simple, repetitive tasks and to follow

simple instructions.  (Id.)  In reaching his conclusion at step four, ALJ McNeil weighed the

mental examinations performed by Dr. Zeiguer and Dr. Friedman as well as the testimony given

by Plaintiff at the hearing.  He concluded that, while Dr. Friedman's examination led to a

conclusion that Plaintiff suffered from a major depressive disorder, the abnormal mental status

findings contained in the doctor's report were "minimal and inconsistent with his ultimate

conclusions regarding Plaintiff's abilities."  (Tr. 26.)  He further found that this conclusion was

supported by evidence from other treating and examining sources.  (Id.)  Indeed, Dr. Zeiguer

assessed that there was no exaggeration of psychiatric problems and that Plaintiff was able to

relate to job responsibilities.  (Id.; Tr. 132-33.)  ALJ McNeil observed that the mental

impairments reported by Plaintiff did not preclude her enjoying gainful employment, as she had

made no statements indicating that she would have difficulty interacting with coworkers and

supervisors in a work setting.  (Tr. 27.)

Having found that Plaintiff retained the residual functional capacity to perform her past

work as a machine operator and packer, ALJ McNeil did not advance to step five.

**E.**   **Analysis**

Plaintiff argues that ALJ McNeil's conclusion that Plaintiff is not disabled within the

meaning of 42 U.S.C. §§ 216(I) and 223 is not supported by substantial evidence.  (Pl.'s Br. 5.)

**1.**   **The Commissioner's Determination is Supported by Substantial Evidence**

ALJ McNeil's opinion indicates that he properly considered the evidence of Plaintiff's

complaints, including the evidence that Plaintiff refers to in her brief: Dr. Zeiguer's psychiatric

prognosis (also noting that Dr. Zeiguer concluded that Plaintiff was able to relate to job

responsibilities and handle her own benefits) (Tr. 25-26), Dr. Vastesaeger's diagnoses (also

noting Dr. Vastesaeger's conclusions that Plaintiff was not in acute distress and that her

intellectual functions were intact) (Tr. 24), and Dr. Friedman's findings (also noting that Plaintiff told Dr. Friedman that her medications for dizziness and nerves alleviated those symptoms) (Tr. 26).

This Court finds that ALJ McNeil's conclusion at step two, that Plaintiff's physical impairments were not severe, is supported by substantial evidence.  Plaintiff's testimony and the medical evidence indicates that her physical conditions were controlled through the use of medications.  Plaintiff testified at the hearing before ALJ McNeil that she used an Albuterol inhaler for her asthma and that it helped alleviate the problem.  (Tr. 42, 134, 166.)  Moreover, Dr. Siclali of Dr. Ortiz's office testified via telephone that Plaintiff's asthma was mild.  (Tr. 126.) Subjective statements by Plaintiff concerning her alleged dizziness and fainting are not supported by all of the medical evidence in the record.  The files of Dr. Ortiz only mention complaints of dizziness on two occasions.  (Tr. 157, 159.)  Additionally, the record contains no underlying neurological findings that would support Plaintiff's alleged dizziness and fainting spells.  Indeed, Dr. Siclali of Dr. Ortiz's office testified via telephone that Plaintiff did not have a history of seizures and speculated that her dizziness was the result of her antidepressant medication.  (Tr. 126.)  The ALJ also noted that Plaintiff testified that she had not been instructed to carry a cane. (Tr. 26, 41.)

As to ALJ McNeil's conclusion that Plaintiff's mental impairment did not deprive her of the residual functional capacity to perform light work, this Court finds that the conclusion of ALJ McNeil is supported by substantial evidence.  ALJ McNeil found that Dr. Friedman's conclusion that Plaintiff suffered from a major depressive disorder was based upon a single observation of the Plaintiff and did not carry as much weight as findings by other treating and examining

17

sources.  He also noted that Dr. Friedman's conclusions appear to be inconsistent with Dr. Friedman's own findings concerning Plaintiff's abilities.  (Tr. 26.)  ALJ McNeil noted that Dr. Friedman's conclusion is contradicted by Plaintiff's testimony, which indicates that her mental impairment limits her only in regard to concentration and nervousness and that she did not have problems dealing with people.  (Tr. 27.)  He further found that Plaintiff's mental conditions could be controlled with tranquilizers and psychotropic medications and that there was no indication in the record that she had ever been hospitalized or required ongoing psychiatric treatment for the alleged mental impairment.  (Id.)  Plaintiff told her treating physician that the Zoloft that he prescribed was working well.  (Tr. 159.)  She also indicated to Dr. Zeiguer that she did not have a history of psychosis, psychiatric hospitalization, or suicide attempts, and denied any symptoms of anxiety.  (Tr. 133.)  Dr. Vastesaeger noted that Plaintiff had not been hospitalized as a result of her depression nor had she been treated by a psychiatrist.  (Tr. 166.)

As to Plaintiff's alleged borderline intelligence, although Dr. Friedman stated that her intelligence was borderline (Tr. 189), Dr. Zeiguer found that Plaintiff was of normal intelligence (Tr. 132), and Dr. Vastesaeger reported that Plaintiff's intellectual functions were intact (Tr. 167).

For the foregoing reasons, this Court concludes that ALJ McNeil's conclusions are supported by substantial evidence.

### 2. Plaintiff Asserts that the Commissioner Improperly Evaluated the Medical Evidence

Plaintiff contends that the Commissioner has failed to give credence to her subjective complaints and that those complaints are fully supported and uncontradicted by the medical

evidence.  (Pl.'s Br. 6-8.)

Plaintiff fails to develop her argument adequately.  She does not indicate which step she believes ALJ McNeil decided incorrectly nor does she make any argument showing how a different analysis at any of the steps would have produced a different result.  The burden of proof rests on the plaintiff to show proof of her disability.  42 U.S.C. § 423(d)(5).  Plaintiff has not argued, no less persuaded this Court, that ALJ McNeil would have reached a different conclusion at any step of the five-step analysis of Plaintiff's impairments had he weighed her subjective complaints differently.  Indeed, ALJ McNeil's opinion presents a reasoned weighing of the evidence both for and against disability, and concludes with a finding of "not disabled" that is supported by substantial evidence.

At step two, ALJ McNeil noted that Plaintiff reported that she experiences asthma attacks and dizziness and that she blacks out approximately five times each month.  (Tr. 24.)  However, ALJ McNeil found that, while Plaintiff claimed that her asthma, dizziness, and seizures prevented her from working, the asthma was mild and controlled and the medical record showed no signs of a neurological impairment that would result in seizures or dizziness.  To buttress these conclusions, ALJ McNeil referred to the medical report of Dr. Vastesaeger, which reported that Plaintiff was not in acute distress and that she had a normal respiratory rate.  (Tr. 24.)  ALJ McNeil also referred to testimony from Dr. Siclali in which he said that Plaintiff had no history of seizures and that her dizziness was probably caused by her medication or anxiety.  (Id.)  Additionally, while Plaintiff asserted subjective evidence that she was unable to work due to her asthma, she also testified that her asthma was controlled through the use of an inhaler and that she has never been hospitalized as a result of her asthma.  (Tr. 26.)

At step three, ALJ McNeil considered Plaintiff's subjective assertion that she suffered from a debilitating major depressive disorder.  (Tr. 25.)  However, the ALJ found that the character of her impairment was not such that it met the criteria of the relevant listing.  (Tr. 27.)  Indeed, the survey completed by the state agency doctor who examined the medical record indicated the same.  (Tr. 197.)  Additionally, ALJ McNeil noted that Plaintiff stated to Dr. Zeiguer that she would not describe herself as depressed.  (Tr. 25.)

At step four, ALJ McNeil concluded that, while the medical report of Dr. Friedman contained evidence that supported Plaintiff's subjective claim that she suffered from a debilitating major depressive disorder, the symptomology of Plaintiff's condition, as presented in the medical reports and her own testimony, was not such that it would preclude her from performing light work.  (Tr. 26-28.)  ALJ McNeil found that the report of Dr. Zeiguer contradicted both Plaintiff's subjective complaints and Dr. Friedman's report.  (Tr. 26.)  ALJ McNeil notes that Dr. Zeiguer's report stated that Plaintiff's thoughts were logical, that there was no evidence of psychosis, that her mood was stable, and that her affect was appropriate.  (Tr. 25.)  Additionally, Plaintiff denied any symptom of anxiety to Dr. Zeiguer and said that she would not describe herself as depressed.  (Id.)

This Court finds that ALJ McNeil weighed Plaintiff's subjective complaints and noted contradictory medical and subjective evidence.  This Court will not view the evidence in the record de novo to determine if Plaintiff is or is not disabled within the meaning of the Social Security statutes and regulations.  42 U.S.C. §§ 405(g), 1383(c)(3); Stunkard, 841 F.2d at 59.  Rather, this Court, in adherence to the applicable standard of review, finds that evidence for and against a finding of disability was presented to ALJ McNeil, that he weighed this evidence

appropriately, and that his finding of "not disabled" is supported by substantial evidence.

Plaintiff also alleges that ALJ McNeil failed to consider whether Plaintiff's impairments in combination would equal a listing.  (Pl.'s Br. 9-10.)  It is true that the ALJ must consider all of the alleged impairments individually and in combination to determine if they amount to a qualifying disability.  42 U.S.C. § 423(d)(2)(B).  Plaintiff, however, still bears the burden in the first four steps of demonstrating how her impairments, individually or in combination, amount to a qualifying disability.  Burnett, 220 F.3d at 118.  Here, Plaintiff has offered no explanation of how her impairments, considered together, would equal the requirements of a listing. Additionally, this Court will not assume that ALJ McNeil failed to consider the combined effects of Plaintiff's impairments simply because there is no explicit statement in his opinion that he has done so.  The ALJ is not required to employ a particular formula in his opinion.  Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004).

**3.      Plaintiff Asserts that the Commissioner Erred as a Matter of Law in Finding that Plaintiff Can Perform the Full Range of Light Work**

Plaintiff contends that ALJ McNeil's finding that Plaintiff retains the residual functional capacity to perform light work is "merely conclusory and is not supported by the medical evidence," and that the opposite is actually true.  (Pl.'s Br. 10-11.)  In her brief, however, Plaintiff offers nothing more than the following sentence fragment as explanation for this position: "Plaintiff's non exertional [sic] impairment, i.e., depression, borderline intellect, suicidal ideations, as well as the need to avoid extremes of heat, cold, wetness, humidity and fumes, odors, dusts, gases and poor ventilation."  (Pl.'s Br. 11.)  Plaintiff presents nothing further to support her contention that ALJ McNeil erred

in finding that Plaintiff was able to perform light work.

Despite disagreement with the disability determination, the ALJ's decision must stand if it is supported by substantial evidence.  Perkins v. Barnhart, 79 Fed. Appx. 512, 515 (3d Cir 2003).  As discussed supra, ALJ McNeil's step four determination is supported by substantial evidence.

## **CONCLUSION**

For the reasons stated above, this Court finds that the Commissioner's decision is supported by substantial evidence and is AFFIRMED.

Dated: August 9, 2006

 S/Joseph A. Greenaway, Jr.          
JOSEPH A. GREENAWAY, JR., U.S.D.J.